# IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ALABAMA WESTERN DIVISION

| | |
|---|---|
| **DR. RICHARD D. FRIEND, DR. JIMMY S. TU, UNIVERSITY EMERGENCY PHYSICIANS GROUP, INC., DR. JOHN OLEN NEWCOMB, DR. INKIL HWANGPO, DR. ALISA JOHNSON, DR. MARTIN JAMES SMITH, DR. THOMAS J. KELLY, and DR. ERIC CURLEY;** | |
| **Plaintiffs,** | **Civil Action No.:** _____ |
| **v.** | |
| **TEAM HEALTH, INC.; and PARAGON CONTRACTING SERVICES, LLC, F/K/A PARAGON CONTRACTING SERVICES, INC., D/B/A TEAM PRIMARY CARE PHYSICIANS OF ALABAMA, INC.;** | |
| **Defendants.** | |

## COMPLAINT

COME NOW the Plaintiffs, Dr. Richard D. Friend, Dr. Jimmy S. Tu, University Emergency Physicians Group, Inc., Dr. John Olen Newcomb, Dr. Inkil Hwangpo, Dr. Alisa Johnson, Dr. Martin James Smith, Dr. Thomas J. Kelly, and Dr. Eric Curley (collectively, "Plaintiffs"), and bring this civil action to recover damages against the above-named Defendants, and for their causes of action would show unto the Court the following:

## NATURE OF THE ACTION

1.     Plaintiffs file this lawsuit due to Defendants' routine and systematic failure to pay physicians for the services they provide to their patients.

2.     In particular, Defendants Team Health and Paragon represented to each Plaintiff in the they contracts signed that (a) Defendants would count the Relative Value Units ("RVUs") earned when patients were treated by nurse practitioners and/or physician assistants working under the physician's direction (hereinafter "Assisting RVUs"), (b) they would multiply those Assisting RVUs by the facility multiplier, and (c) they would pay each Plaintiff the product resulting from the multiplication of those two numbers.

3.     By failing to pay the required bonus, Defendants are in breach of their contracts, have deceived the physicians, and have been unjustly enriched.

4.     When Defendants promised to include the Assisting RVUs as part of Plaintiffs' total RVUs for bonus purposes, Defendants admittedly had a policy not to include Assisting RVUs in Plaintiff's total RVUs.

5.     In Dixie Emergency Physicians, LLC, et al., v. Team Health, Inc., et al., No. 7:16-cv-01622-LSC (N.D.AL), other physicians at the same facility as the named Plaintiffs sued Defendants, and Defendants admitted breaching substantially similar contracts using substantially similar language. (*See* Case No. 7:16-cv-01622-

LSC, Doc. 50 at ¶ 20 & ¶¶ 45–49 (Plaintiff's Second Amended Complaint) and Doc. 55 at ¶¶ 45–49 (Defendant's Answer).

6.    Despite their prior admission of breach, Defendants failed and refused to pay the named Plaintiffs and other physicians in the DCH system. Consequently, Plaintiffs were forced to file this lawsuit.

## PARTIES, JURISDICTION, AND VENUE

7.    Plaintiff Dr. Richard D. Friend is over the age of nineteen (19) years and is a citizen of Tuscaloosa County, Alabama.

8.    Plaintiff Dr. Jimmy S. Tu is over the age of nineteen (19) years and is a citizen of Tuscaloosa County, Alabama.

9.    Plaintiff University Emergency Physicians Group, Inc., is an Alabama corporation. Plaintiff Dr. John Olen Newcomb is its President.

10.    Plaintiff Dr. John Olen Newcomb is over the age of nineteen (19) years and is a citizen of Tuscaloosa County, Alabama.

11.    Plaintiff Dr. Inkil Hwangpo is over the age of nineteen (19) years and is a citizen of Tuscaloosa County, Alabama.

12.    Plaintiff Dr. Alisa Johnson is over the age of nineteen (19) years and is a citizen of Tuscaloosa County, Alabama.

13.    Plaintiff Dr. Martin James Smith is over the age of nineteen (19) years and is a citizen of Mojave County, Arizona.

14.     Plaintiff Dr. Thomas J. Kelly is over the age of nineteen (19) years and is a citizen of Coffee County, Alabama.

15.     Plaintiff Dr. Eric Curley is over the age of nineteen (19) years and is a citizen of Denton County, Texas.

16.     Defendant Team Health, LLC (hereinafter "Team Health"), is a Tennessee limited liability company with its principal place of business in Knoxville, Tennessee. Team Health was doing business in the State of Alabama at all times material herein. Team Health's sole member is Team Finance, LLC, a Delaware limited liability company. Team Finance, LLC's sole member is Team Health Holdings, Inc, a Delaware corporation with its principal place of business in Knoxville, Tennessee.

17.     Defendant Paragon Contracting Services, LLC, f/k/a Paragon Contracting Services, Inc., d/b/a Team Primary Care Physicians of Alabama, Inc. (hereinafter "Paragon") is a Florida limited liability company with its mailing address in Knoxville, Tennessee, and its principal place of business in Taramac, Florida. Paragon was doing business in the State of Alabama at all times material herein. Paragon operates under Team Health's dominion and control and at Team Health's direction. Paragon's sole member is Southwest Florida Emergency Management, LLC, a Florida limited liability company, with its principal place of business in Tamarac, Florida. Southwest Florida Emergency Management, LLC's

sole member is Team Finance, LLC, a Delaware limited liability company. Team Finance, LLC's sole member is Team Health Holdings, Inc, a Delaware corporation with its principal place of business in Knoxville, Tennessee. Paragon was doing business in the State of Alabama at all times material herein. Paragon is a separate legal entity but operates under Team Health's dominion and control, and at Team Health's direction, to perpetuate and form the scheme and enterprise explained further below. Paragon acts as the agent of Team Health.

18.     This Court has jurisdiction under 28 U.S.C. § 1332 because there is diversity of citizenship and an amount in controversy greater than $75,000. This Court also has jurisdiction pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201–2202.

19.     Venue is proper pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to this complaint occurred in this district, or alternatively, Defendants are both subject to the Court's personal jurisdiction with respect to this action.

## STATEMENT OF FACTS

### A.   Background

20.     Defendants contract with physicians, such as Plaintiffs, to handle emergency care at hospitals such as the DCH Regional Medical Center in Tuscaloosa, Alabama, and Northport Medical Center in Northport, Alabama (both hospitals are part of the DCH Health System). Because Defendants signed an

exclusive contract with Northport, emergency care physicians could not contract with the hospital directly. The physicians were required to contract with Defendants in order to work in the Northport emergency room.

21.     Under Paragon's contracts with Northport and Plaintiffs, Defendants made money based on the patients each physician was responsible for during his or her shift and the services provided to each patient.

22.     If a physician was unproductive while on duty, Defendants makes less money on that physician, but if a physician was industrious and took responsibility for more patients, Defendants makes more money.

## B.     The RVU Bonus Program

23.     In 2014, Defendants sought to add a bonus program to the contracts of the physicians at Northport in order to incentivize the physicians to take on responsibility for more patients during each shift so Defendants could bill more and make more money.

24.     This program was also motivated by the need to attract and retain physicians to DCH and the Tuscaloosa market, where it is more difficult to get physicians to come work than a larger metropolitan area and was presented to the physicians as a way for them to make more money as well.

25.     Defendants' system relies on "relative value units" ("RVUs") to determine the amount of each physician's bonus. RVUs assign a value to each

service provided and the resources used to provide that service. The RVUs used by Defendants are based on a similar system initially set up by Medicare to help it determine how much it will reimburse healthcare providers when the provider bills Medicare for services.

26.     RVUs are generated when physicians see the patients directly and when they supervise nurse practitioners and physician assistants (hereinafter "Mid Level Providers" or "MLPs")[1] who treat patients under the physician's direction.

27.     RVUs generated through Plaintiffs' supervision of MLPs without seeing the patient directly are often referred to as "Assisting RVUs" or "Supervisory RVUs" by Defendants. Receiving bonus credit for the Assisting RVUs is critically important to the physicians at the TH Facilities.

### C.   The Contracts

28.     Plaintiffs agreed to the RVU bonus program and signed new contracts or addendums to old contracts.

29.     Under each plaintiff's contract with Defendants, his or her bonus was to be calculated using simple multiplication of two numbers.

---

[1] In the healthcare industry, "MPLs" are also sometimes referred to as "advanced practice clinicians" or "APCs".

30.    The first number required the parties to count all RVUs attributable either to the physician directly or to the MLPs operating under the physician's direction.

31.    RVUs attributable to MLPs are RVUs that Medicare and other insurers require to be billed under the MLP's biller number, rather than the physician's, based on the billpayers internal rules. If Medicare or the applicable billpayer permitted Defendants to bill an RVU under the physician's biller number, Defendants attributed it to the physician directly because Medicare only reimbursed RVUs billed under MLPs would be paid at 85% of the rate paid for RVUs billed under the physician's biller number.

32.    At Northport, every MLP in the emergency room operated under the direction of the physicians who signed his or her patient charts.

33.    Consequently, every RVU attributable to an MLP was required to be included in the physicians' total RVUs, the first number in the simple multiplication calculation established by the contract.

34.    The second number in the equation was a dollar amount, called a "multiplier," chosen by Defendants in their sole discretion, and Defendants had the explicit authority to change the multiplier in writing.

35.    When the initial Northport RVU bonus addendums were executed, Defendants had not yet determined what the Northport multiplier would be.

36.    Defendants were not contractually obligated to set the multiplier at any specific dollar amount.

37.    No plaintiff was promised that they would make any specific amount above their base pay.

38.    When Defendants decided on a multiplier for Northport, they unilaterally chose $18 at the Northport multiplier.

39.    Defendants contractually reserved to themselves the right to change the Northport multiplier.

40.    To determine a physician's pay under the contract terms, one must add all of the RVUs attributable to the physician and all of the RVUs attributable to MLPs operating under the physician's direction when the physician had properly signed off on the MLPs' patient charts. That total RVU number must then be multiplied by $18 to determine the physician's pay.

41.    The contracts make clear that the total RVUs, the first number in the payment formula, requires the parties to count both the physician and MLP RVUs:

> At the end of each calendar month (a "Month"), during the term of this Agreement, Company shall, with respect to the Emergency Department at Northport Medical Center, determine, in its sole discretion and in accordance with its accounting procedures, the total relative value units ("Total RVU's") generated by Professional during Company's billing cycle associated with that Month (the "Billing Cycle") **including Total RVU's attributable to Company's nurse practitioners and/or physician assistants while providing their services under Professional's direction** during that

Billing Cycle (collectively, "Professional's Total RVU's"). For purposes of this Agreement, relative value units ("RVU's") shall be based on Medicare Relative Value Units.

(Taken from one of the plaintiffs' contracts, but all have similar or identical language) (emphasis added)).

42.     Although the contracts allowed Defendants the discretion to use their own accounting procedures for counting RVUs, the contracts still required Defendants to count the RVUs attributable to the MLPs. Moreover, once RVUs were counted, Defendants were required to multiply that total by $18 and pay each Plaintiff accordingly.

43.     Subsequent addendums were even more clear, explaining in more detail who was considered to be working under a physician's direction:

Determine the total Relative Value Units ("Total RVU's") generated by Professional in the Emergency Department at Northport ("Professional's Total RVU's") during Company's billing cycle that ended in the last preceding Month (the "Prior Billing Cycle"). In the event Company and/or Company's affiliate supplies nurse practitioners and/or physician assistants in the Emergency Department at Northport, **Professional's Total RVU's shall include Total RVU's attributable to nurse practitioners and/or physician assistants while providing their services under Professional's direction and whose patient charts have been documented and signed off on by Professional during that Prior Billing Cycle**. For purposes of this Agreement, the term "Relative Value Unit" shall correspond to that number assigned to the service as published by the Centers for Medicare and Medicaid Services for the appropriate CPT Code, which number was in effect at the time the service was provided.

(Taken from an addendum to one of the plaintiffs' contracts) (emphasis added).

### D.   Assisting RVUs Explained

44.   The importance of RVUs "attributable to nurse practitioners and/or physician assistants while providing their services under Professional's direction and whose patient charts have been documented and signed off on by Professional during that Prior Billing Cycle" being counted in the physician's total RVUs is best understood in the context of patient charts.

45.   A physician is responsible for every patient whether he or she sees the patient directly or whether he or she supervises an MLP's treatment plan. Every patient chart requires a physician to sign his or her name attesting to the fact that he or she is taking personal responsibility for the patient's treatment.

46.   If the physician sees the patient directly, he or she must commit to the following attestation, or something similar, in the patient's chart:

> I personally evaluated and examined the patient in conjunction with the MLP [("Mid Level Provider")] and agree with the assessment and treatment plan and disposition of the patient as recorded by the MLP.

47.   When an MLP sees a patient under the physician's direction, the physician is responsible for the patient's diagnosis and treatment and either works with the MLP to formulate a treatment plan, or if the MLP has already created a treatment plan, the physician reviews and makes changes to the plan to make sure it

is appropriate. In this situation, the physician commits to a second attestation that reads as follows, or other similar language:

> I was personally available for consultation in the emergency department. I have reviewed the chart and agree with the documentation as recorded by the MLP, including the assessment, treatment plan and disposition.

48.    The physician must attest to the preceding on every patient chart where he or she assisted the MLP but did not see the patient directly.

49.    Whether the physician personally sees the patient or not, the charts and attestations therein, as well as the contracts discussed above, all recognize that the physician takes on considerable responsibility for every patient's diagnosis, treatment, and disposition, and spends significant amounts of time assisting those patients through consultation with the MLP and review of the patient charts.

50.    When the physician does not see a patient personally, the contracts require that the physician receive credit for all of this additional work on the patient's behalf through the RVU bonus for the RVUs "attributable to nurse practitioners and/or physician assistants while providing their services under Professional's direction and whose patient charts have been documented and signed off on by Professional during that Prior Billing Cycle." Defendants refer to these RVUs as "Assisting RVUs" or "Supervisory RVUs."

### E.   Defendants' Deception

51.   At all times relevant to this herein, Defendants had a policy to exclude Assisting RVUs from the total RVU count for each physician in the Southeast.

52.   This policy directly contradicted Defendants' representations to Plaintiffs in their written contract terms, but Plaintiffs were not informed of this policy.

53.   Each month, Defendants provided Plaintiffs with a physician scorecard showing the total RVUs earned each month.

54.   In the physician scorecards, Defendants intentionally did not include or itemize the number of Assisting RVUs that were included in the total RVUs.

55.   In the physician scorecards, Defendants also intentionally failed to disclose that they had a policy to exclude Assisting RVUs from the total RVU count for each physician in the Southeast.

56.   Because the scorecard RVU numbers were reported to Plaintiffs by Defendants, Plaintiffs believed the numbers accurately added the total RVUs as required by the contract terms.

57.   Physicians also received paystubs each month indicating the amount earned through their total RVUs during the applicable batch period covered by that month's check.

58.    Because the paystub numbers were reported to Plaintiffs by Defendants, Plaintiffs believed the numbers accurately added the total RVUs as required by the contract terms.

59.    When a Northport physician sought clarification regarding whether RVUs generated by MLPs operating under a physician's direction were counted in the physician's RVUs in the monthly scorecards and paychecks, Defendants, through Marcia Stiles-Lucas as Vice President of Client Services, responded very clearly, "**The physician gets RVUs for every [MLP] record you sign. … You will [n]ever lose RVUs[.]**" (Color and emphasis original.)

60.    Defendants' explanation in Northport echoed the one they gave to the DCH physicians operating under the same contract terms in Tuscaloosa: "Your RVUs come from what is billed — not collected. … **You are also getting the RVUs for all records you see or supervise with an APC. … [Y]ou can't lose RVUs**." (Emphasis added.)

61.    Even though Defendants represented to Plaintiffs that they were being paid in accordance with the contract, Plaintiffs recently learned that Defendants deliberately excluded Assisting RVUs from their total RVUs and failed to multiply each Assisting RVU by $18 and include that sum in their bonus checks.

## COUNT ONE
## BREACH OF CONTRACT

62.     Plaintiffs re-allege all of the allegations in the paragraphs 1 through 61 as if set out in full herein.

63.     Plaintiffs each entered into a valid contract binding on the parties.

64.     Plaintiffs performed under the contracts serving patients in the emergency room at Northport since 2014.

65.     Defendants supplied nurse practitioners and/or physician assistants in the Emergency Department at Northport.

66.     All of the supplied nurse practitioners and/or physician assistants in the Emergency Department at Northport operated under the direction of physicians.

67.     Plaintiffs, as physicians in the Emergency Department at Northport, provided direction to the supplied nurse practitioners and/or physician assistants and documented and signed off on their patient charts.

68.     After each billing cycle, Defendants failed to include the RVUs attributable to the supplied nurse practitioners and/or physician assistants in each Plaintiff's "Total RVUs" as defined in each contract.

69.     After each billing cycle, Defendants failed to multiply the RVUs attributable to the supplied nurse practitioners and/or physician assistants by $18, the Northport RVU Multiplier, and include that amount in each Plaintiff's bonus within 15 days after the end of each calendar month, as required by the contracts.

70.     Plaintiffs earned RVU bonuses under the terms of the contracts that Defendants failed to pay.

71.     As a proximate result, Plaintiffs were damaged.

WHEREFORE, the Plaintiffs demand judgment against the Defendants for damages, including legal fees and costs, in an amount that would be just and proper under the circumstances and under the laws of the State of Alabama.

## COUNT TWO
## FRAUD IN THE INDUCEMENT

72.     Plaintiffs re-allege all of the allegations in the paragraphs 1 through 61 as if set out in full herein.

73.     Defendants had a duty to speak the truth but represented to Plaintiffs in the draft contracts provided to each Plaintiff that all RVUs generated by Plaintiffs, including total RVUs attributable to MLPs while providing their services under Plaintiffs' direction, would be included in their total RVUs and multiplied by the Northport RVU Multiplier of $18.

74.     The crediting of Assisting RVUs to each Plaintiff was a material fact inducing each one to sign a contract and join Defendants' staff or sign an addendum to an existing contract and remain on Defendants' staff.

75.     Plaintiffs reasonably relied on Defendants' explanation that total RVUs included Assisting RVUs to their detriment and signed each contract or addendum.

76.    Defendants' statement was an intentional, reckless, or innocent misrepresentation.

77.    Contrary to the representations made to Plaintiffs, Defendants admittedly had a policy to exclude Assisting RVUs from the total RVU count for each physician in the Southeast.

78.    Even though this policy directly contradicted Defendants' representations to Plaintiffs, Plaintiffs were not informed of this policy.

79.    As a proximate result of Defendants' misrepresentation, Plaintiffs were damaged.

80.    Upon information and belief, Defendants' misrepresentations are part of Defendants' pattern and practice throughout the Southeast at other facilities where Defendants provide emergency physicians.

WHEREFORE, the Plaintiffs demand judgment against the Defendants for damages, including punitive damages, legal fees, costs, mental anguish, and emotional distress, in an amount that would be just and proper under the circumstances and under the laws of the State of Alabama.

## COUNT THREE
## PROMISSORY FRAUD

81.    Plaintiffs re-allege all of the allegations in the paragraphs 1 through 61 as if set out in full herein.

82.     Defendants had a duty to speak the truth but misrepresented to Plaintiffs in the written contracts entered into with each Plaintiff that all RVUs generated by Plaintiffs, including total RVUs attributable to MLPs while providing their services under Plaintiffs' direction, would be included in their total RVUs and multiplied by the Northport RVU Multiplier of $18.

83.     This misrepresentation was a material fact reasonably relied upon by each Plaintiff to sign a contract and join Defendants' staff or sign an addendum to an existing contract and remain on Defendants' staff. This misrepresentation was also a material fact reasonably relied upon by each Plaintiff in remaining on Defendants' staff.

84.     As a proximate result of Defendants' misrepresentation, Plaintiffs were damaged.

85.     At the time Defendants promised that RVUs attributable to MLPs would be counted and included in each Plaintiff's total RVUs and multiplied by the Northport RVU Multiplier, Defendants intended to deceive Plaintiffs and intended not to multiply those RVUs by the Northport RVU Multiplier and include that sum in Plaintiffs' paychecks.

86.     Defendants had a policy to exclude these Assisting RVUs from the total RVU count for each physician in the Southeast.

87.     This policy directly contradicted their representations to Plaintiffs, but Plaintiffs were not informed of this policy.

88.     Defendants' misrepresentations are also part of Defendants' pattern and practice throughout the Southeast at other facilities where Defendants provide emergency physicians.

WHEREFORE, the Plaintiffs demand judgment against the Defendants for damages, including punitive damages, legal fees, costs, mental anguish, and emotional distress, in an amount that would be just and proper under the circumstances and under the laws of the State of Alabama.

## COUNT FOUR
## FRAUD/MISREPRESENTATION

89.     Plaintiffs re-allege all of the allegations in the paragraphs 1 through 61 as if set out in full herein.

90.     Defendants had a duty to speak the truth but intentionally, recklessly, or innocently misrepresented to Plaintiffs the following:

   a.   That they were receiving credit for all RVUs in their bonuses;

   b.   That the physician scorecard accurately reflected the RVUs on which their bonuses were based; and

   c.   That the RVU bonus included credit for supervising RVUs.

91.     These misrepresentations were made in the monthly physician scorecards and paystubs received by each Plaintiff.

92.     Plaintiffs trusted that the representations of the physician scorecards and paystubs were accurate summaries of the total RVUs required to be counted under the contracts multiplied by the facility multiplier of $18.

93.     In reliance on these misrepresentations, Plaintiffs chose to stay with Defendants, even though they could have terminated their contracts with 90-days' notice and took responsibility for more patients seen by MLPs to their detriment, while Defendants substantially increased their profitability, even though Defendants now deny them credit for doing so.

94.     As a proximate result of Defendants' misrepresentations, Plaintiffs were damaged.

95.     Upon information and belief, Defendants' misrepresentations are part of Defendants' pattern and practice throughout the Southeast at other facilities where Defendants provide emergency physicians.

WHEREFORE, the Plaintiffs demand judgment against the Defendants for damages, including punitive damages, legal fees, costs, mental anguish, and emotional distress, in an amount that would be just and proper under the circumstances and under the laws of the State of Alabama.

## COUNT FIVE
## FRAUDULENT SUPPRESSION

96.     Plaintiffs re-allege all of the allegations in the paragraphs 1 through 61 as if set out in full herein.

97.     Defendants had a duty to disclose that they were excluding RVUs attributable to MLPs from the total RVUs multiplied by $18 to calculate Plaintiffs bonuses under the contract.

98.     Defendants knew that it was excluding some RVUs from the total RVUs credited to each Plaintiff but hid this fact from Plaintiffs.

99.     As a result of this suppression, Plaintiffs chose to stay with Defendants even though they could have terminated their contracts with 90-days notice and took responsibility for more patients seen by MLPs to their detriment, substantially increasing Defendants' profitability, even though Defendants now deny Plaintiffs credit for doing so.

100.    As a proximate result of Defendants' misrepresentations, Plaintiffs were damaged.

101.    Upon information and belief, Defendants' suppression is part of Defendants' pattern and practice throughout the Southeast at other facilities where Defendants provide emergency physicians.

    WHEREFORE, the Plaintiffs demand judgment against the Defendants for damages, including punitive damages, legal fees, costs, mental anguish, and

emotional distress, in an amount that would be just and proper under the circumstances and under the laws of the State of Alabama.

## COUNT SIX
## UNJUST ENRICHMENT

102.   Defendants knowingly, intentionally and fraudulently accepted and retained a benefit from Plaintiffs, *i.e.*, the direction of MLPs in the emergency department at Northport from 2014 through 2018.

103.   Plaintiffs had a reasonable expectation of being compensated for the benefit conferred on Defendants.

104.   Defendant knowingly, intentionally and fraudulently failed to compensate Plaintiffs for the benefit conferred and hid that fact from Plaintiffs.

105.   As a proximate result, Plaintiffs were damaged.

WHEREFORE, the Plaintiffs demand judgment against the Defendants for damages, including punitive damages, legal fees, and costs, in an amount that would be just and proper under the circumstances and under the laws of the State of Alabama.

## COUNT SEVEN
## DECLARATORY JUDGMENT

106.   Plaintiffs re-allege all of the allegations in the paragraphs 1 through 61 as if set out in full herein.

107.   This Count is brought to determine the rights and duties of the Parties under various Medical Professional Independent Contractor Agreements described above.

108.   A controversy exists between Defendants and Plaintiffs as to the parties' rights to bonus compensation for assistance and supervision of MLPs as described above.

109.   Plaintiff seek a Declaratory Judgment by the Court pursuant to 28 U.S.C. §§ 2201-2202 determining the rights of Plaintiff, and injunctive relief affording an accounting, restitution, and future payment of all Assisting RVUs.

WHEREFORE, Plaintiffs seek a declaratory judgment and Court Order providing an accounting of the Assisting RVUs Defendants have not multiplied by the facility multiplier of $18 and paid, an Order indicating that this is a proper case for declaratory judgment relief, that there is a bona fide controversy among the Parties and, that upon final hearing, that the Court declare that Plaintiffs are entitled to bonus compensation for assistance and supervision of MLPs, legal fees and costs and such other relief as they are entitled.

*s/ Daniel B. Snyder*
Daniel B. Snyder
Ala. Bar No. ASB-6318-N72S
Floyd D. Gaines
Ala. Bar No. ASB-5629-G51F
Attorneys for Plaintiffs
GAINES LLC
2160 Highland Avenue South, Suite 101

Birmingham. AL 35205
fgaines@gainesllc.com
dsnyder@gainesllc.com
Office Number: 205.598.5055
Fax Number: 205.598.5066
Floyd Gaines Direct: 205.598.5089
Daniel Snyder Direct: 205.598.5076

## JURY DEMAND

**Plaintiffs demand a trial by jury of all issues so triable pursuant to Rule 38 of the Federal Rules of Civil Procedure.**

*s/ Daniel B. Snyder*
Daniel B. Snyder
Ala. Bar No. ASB-6318-N72S
Floyd D. Gaines
Ala. Bar No. ASB-5629-G51F
Attorneys for Plaintiffs
GAINES LLC
2160 Highland Avenue South, Suite 101
Birmingham. AL 35205
fgaines@gainesllc.com
dsnyder@gainesllc.com
Office Number: 205.598.5055
Fax Number: 205.598.5066
Floyd Gaines Direct: 205.598.5089
Daniel Snyder Direct: 205.598.5076

## DEFENDANTS TO BE SERVED

Team Health, LLC
c/o Registered Agent: The Prentice-Hall Corporation System, Inc.
2908 Poston Ave.
Nashville, TN 37203-1312

Paragon Contracting Services, LLC
c/o Registered Agent: Corporation Service Company Inc
641 South Lawrence Street
Montgomery, AL 36104